**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | § | |
| | § | |
| **v.** | § | **CRIMINAL NO.:  4:25-CR-065** |
| | § | |
| **ANGEL VILLARREAL-RESENDIZ** | § | |
| | § | |
| **Defendant.** | § | |

**GOVERNMENT'S RESPONSE TO DEFENDANT'S**
**MOTION TO SUPRESS**

**TO THIS HONORABLE COURT:**

The United States of America, by and through Acting United States Attorney John G.E. Marck, and the undersigned Assistant United States Attorney, hereby presents this brief in reply to the Defendant's Motion to Suppress (hereafter "Defendant's Motion"). In support thereof, the Government shows the following:

**FACTUAL BACKGROUND**

**I.      Investigation**

On August 10, 2023, the National Center for Missing and Exploited Children

Page **1** of **15**

("NCMEC") received a report regarding an unknown suspect who uploaded apparent child pornography to an online cloud storage account utilized by Verizon Wireless communications users. It was further determined that the uploads occurred in the State of Texas.

On August 5, 2024, Sergeant Steve O'Neal, an investigator with the Office of the Attorney General of Texas, Criminal Investigations Division, Child Exploitation Unit, was assigned to review the reported files, and subsequently determined that the uploaded content did indeed meet the definition of child pornography under Texas Penal Code Chapter 43. On that same day, Sgt. O'Neal applied for, and later received, a search warrant for the online cloud storage account relating to cell phone number 936-425-0007. The data from the account was subsequently obtained on August 28, 2024 and upon review, Sgt. O'Neal determined that the account belonged to the Defendant Angel Villareal's nineteen-year-old son, Alexis Villareal. The account information further established Alexis Villareal's residence at 108 Gospel Hill Rd. in Huntsville, Texas.

Sergeant O'Neal searched the Walker County Central Appraisal District website and learned that the listed owners of 108 Gospel Hill Road were Magda Castaneda and the Defendant Angel Villarreal, the parents of Alexis Villareal. Alexis's residence at the address was further corroborated by the listed address on his Texas Driver's License. Sgt. O'Neal also learned that Saimy Villarreal—Angel and Magda's twenty-one-year-old daughter—was a

resident of 108 Gospel Hill Road.

## II.    <u>Warrant</u>

On January 23, 2025, Sergeant O'Neal sought a warrant authorizing the search of Alexis Villarreal's person and the premises of 108 Gospel Hill Road. On that same day, The Honorable Tracy Sorensen of the 278th District Court of Walker County, Texas approved the application and issued a warrant for the search. (Signed Warrant and supporting affidavit attached hereto, and henceforth referred to as "Exhibit A")

From the outset, Sgt. O'Neal's warrant affidavit described the property to be searched as follows:

> Said location [108 Gospel Hill Rd. Huntsville, Tx 77320] is more particularly described as: a manufactured home, constructed of light, tan-colored siding construction with light-colored trim. The manufactured home is one of three structures visible on the property. This structure appears to be the main residence based on the size and condition of it as opposed to the other two. The property is not visible from the roadway based on the tall wood fence and the foliage/trees on the property…. *Exhibit A,* p. 1.

Due partially to an inability to obtain an un-obstructed view of the premises from his legal vantage point of the public roadway, along with his reasonable belief that the property appeared to be a family compound of sorts consisting of multiple dilapidated structures in addition to the primary residence, Sgt. O'Neal also sought conditional approval to search "all other buildings, structures, places and vehicles on said premises and within the curtilage, if

said premises [are] a residence, which are found to be under the control of [Alexis Villareal] and in, on, or around which said suspected party may reasonably reposit or secrete property which is the object of the search requested herein." *Id*. at 1.

Furthermore, Sgt. O'Neal noted that there was also a single mailbox for the property with the name "Villareal" printed on the side and included a photo in his affidavit (reproduced below). *Id.*



Based on his investigation to that point, and his reasonable belief that the property was occupied by one family with a singular address, who all had equal access to the suspected primary living structure and any outbuilding, Sgt. O'Neal goes on to describe that "[s]aid suspected place and premises are in the charge of and controlled by each of the following persons and other person or persons unknown to the Affiant." *Id.* at 3.

VILLAREAL, ALEXIS W/M DOB: 03-06-2006
VILLAREAL, ANGEL W/M DOB: 02-12-1980
FAULLON, MAGDA W/F DOB: 05-25-1979
VILLAREAL, SAIMY W/F DOB: 12-29-2002. *Id.*

Once approved by the court, the warrant commanded the search of (1) Alexis's person, (2) the tan-colored manufactured home, and (3) any other building under Alexis's control where he could have reasonably stowed or secreted evidence of child pornography. *Id.* at 12-13. Among a lengthy list of potential items, the warrant commanded the seizure of any and all computers, hard drives, flash drives, cellular phones, and items that could be used to store digital media. *Id.* Additionally, the warrant commanded the seizure of:

> Documents showing dominion and control over the residence such as letters, utility bills, telephone bills, miscellaneous bills, pager bills and receipts for occupants, articles of personal property tending to establish the identity of the· persons in control of the premises, vehicles, storage areas, safes, out buildings and containers being searched including utility company receipts, rent receipts, addressed envelopes, and keys and photographs of the defendant and his/her associates. *Id.* at 14.

## III.    Search of 108 Gospel Hill Rd.

At approximately 8:00am On January 24, 2025, law enforcement personnel from the Attorney General's Office and the Huntsville Police department entered the Villarreals' property in order to execute the search warrant. Toward the outset of the search, Alexis Villareal approached Sgt. O'Neal from an area across from the manufactured home and indicated to Sgt. O'Neal that he occupied a small one room structure directly across from the main residence. This information was passed to the other officers at the scene assisting with the search and, in accordance with the warrant, some officers on scene were then diverted to

search the structure Alexis claimed as his. It was also established that Alexis's father (the Defendant), mother, sister, and his sister's husband occupied the manufactured home, and were on the premises at the time of the search.

The inside of Alexis's structure resembled a small bedroom with no bathroom, shower or kitchen. Based on further conversation with Alexis and the circumstances apparent to him at the time, Sgt. O'Neal believed Alexis occupied the structure as his private space and bedroom in order to sustain some form of privacy away from his family, much like simply having a bedroom to himself. However, O'Neal and the rest of the team also reasonably believed that Alexis had access and control of the rest of the premises, including the manufactured home and any other structure on the property. This is, in part, based on the fact that Alexis was the 18-year-old son of the property's owners, and the structure that was "his" lacked essential features of a residence such as a bathroom, shower, or kitchen. It should also be noted that Alexis's alleged criminal conduct occurred over approximately the two years preceding the search, a time period that would include Alexis being a minor. Naturally, it would be hard to imagine that a 16-year-old minor lived in a completely separate residence from his parents during this time, especially with no access to a restroom or a facility to clean himself. Instead, Officers reasonably believed that, at the very least, Alexis had unrestricted access to the manufactured home in which his family occupied steps away from his own room.

With the reasonable belief that Alexis had access and control to the entirety of the premises and structures on the property, the officers proceeded to search Alexis's "room" as well as the primary residence in which his family occupied. During the course of the search of the manufactured home, officers encountered a locked safe in the bedroom of the Defendant and his wife. At this time, the Defendant was not under any suspicion of criminal activity and, while not free to roam about his home during the search (due to concerns of potential evidence tampering and officer safety reasons), he was free to otherwise come and go as he pleased and was not being detained by law enforcement.

Reasonably believing the safe could be a place that Alexis could secret items such as cell phones, flash drives, or computer hardware capable of containing evidence of criminal activity, Officers asked the residents who had the code to the safe. At this time, the Defendant voluntarily informed officers that he had the code, but that he could not remember it unless he was physically looking at it. Concerned about the integrity of the search if they allowed the Defendant to physically go inside the home, officers took a photo of the safe with a cell phone and showed it to the Defendant while he waited outside. At this point the Defendant was able to remember the code and voluntarily provided it to officers.[1] The Defendant was not

---

[1] It should be noted that this fact was not known to defense counsel prior to the time Defendant filed his motion to suppress. In writing this response and speaking with officers involved, the Government learned that a Huntsville Police Department report had not been received in discovery, and therefore had not yet been disclosed to defense. This report has since been obtained by the US Attorney's office and has been disclosed to defense counsel as of April 9, 2026.

instructed, coerced, or threatened to provide the code and was only told that if he didn't want to provide the code voluntarily, Officers would have to force the safe open, which would almost certainly prevent it from being functional in the future. Once inside the safe, a collection of twelve firearms, including two stolen firearms were located.

Subsequently, it was learned that the Defendant was an alien residing in the country illegally.

## ARGUMENT

I.   **The Defendant's Fifth Amendment Rights were not violated when he volunteered the code to the safe.**

In order for the Fifth Amendment Privilege against self-incrimination to apply, the relevant "communication must be testimonial, incriminating, *and compelled*." *Hiibel v. Sixth Jud. Dist. Ct. of Nevada, Humboldt Cnty.*, 542 U.S. 177, 189 (2004)(emphasis added). Furthermore, "the bar for compulsion under the Fifth Amendment is high, requiring a defendant to show that his 'will was overborne in such way as to render his confession the product of coercion', based on a 'totality of all the surrounding circumstances." *United States v. Curry*, 158 F.4th 153, 158 (3d Cir. 2025), cert. denied, (U.S. Feb. 23, 2026)(quoting *Arizona v. Fulminante*, 499 U.S. 279, 288, 111 (1991).

Here, the Defendant asserts that he was surrounded by a team of armed officers

and "instructed" to provide the code to the safe. *Defendant's Motion* at 12. He goes on to say that he was never explicitly given a choice in the matter and thus, given the circumstances "he believed he had no right to refuse." *Id.* The facts as the Government understands them, simply do not support this notion.

First, the Government disagrees with the assertion that the Defendant was "instructed" to provide the code. While waiting outside for the search to be conducted, the Defendant was *asked* if he had the code to the safe and he replied in the affirmative. At this time, he was outside and, while not free to go inside his home while the search was being conducted, his liberty was not in any other way inhibited nor was he threatened into giving the code. Importantly, it must also be noted that the Defendant was not suspected of any criminal activity at the time nor was he even contemplated as a potential target of the investigation. Certainly, a group of armed officers executing a search warrant in one's home would be likely be intimidating to anyone, but that fact alone does not overcome the high bar the Defendant must meet to show that his will was overcome such that his statements were compelled. *See U.S. v. Curry, supra* at 158. Without facts to support such claimed compulsion, the Defendant's argument must fail.

**II.**    **The Government concedes that the Defendant's statement that "I didn't steal anything" was improperly obtained after the Defendant had invoked his Fifth Amendment right to counsel.**

The Government agrees with the core of Defendant's factual rendition and legal argument on this particular point. Once the Defendant invoked his right to counsel at the Huntsville Police Department, the custodial interview should have ceased. Defendant's statement that "I didn't steal anything" in response to Detective Lehman's summation of the evidence against him, whether intentional or not, was improperly obtained and should be suppressed.

**III.**    **The search of the Defendant's residence was legally authorized and remained so throughout the search.**

The Defendant's argument for suppression of the search of his home is premised on the notion that once officers were told by Alexis Villareal that he resided in the structure across from the manufactured home, that the officers were then obligated to cease their search of any other part of the property. *Deft. Motion* at 15. However, Defendant's reliance on *Maryland v. Garrison* 480 U.S. 79 (1987) to support this notion is misplaced as the two scenarios are easily distinguishable.

In *Garrison,* officers reasonably believed that the target of their investigation, Lawrence

McWebb, lived in an apartment that occupied the entire third floor of an apartment building. *Maryland v. Garrison* 480 U.S. 79, 80 (1987). They then properly obtained and executed a valid search warrant for the third floor unit of the premises and began their search. However, unbeknownst to them at the time, the third floor was in fact divided into two apartments, one belonging to the intended target, McWebb, and the other occupied by the respondent Garrison. *Id.* "Before the officers executing the warrant became aware that they were in a separate apartment occupied by [Garrison], they had discovered the contraband that provided the basis for [Garrison's] conviction for violating Maryland's Controlled Substances Act." *Id.* While the Court held that the Officers search was valid because they acted on a good faith honest basis and took reasonable steps "to ascertain and identify the place intended to be searched," it also explained that the Officers were "required to discontinue the search of [Garrison's] apartment as soon as they discovered that there were two separate units on the third floor." *Id.* at 87. The underlying reasoning behind the Court's holding was "the need to allow some latitude for honest mistakes that are made by officers in the dangerous and difficult process of making arrests and executing search warrants." *Id.*

On the other hand, the Defendant's case is easily distinguishable from *Garrison* as there was never a mistaken belief that unwittingly lead officers to executing an overbroad warrant that would then necessitate reigning in the scope of their search once their mistake was

realized. Instead, Sgt. O'Neal had probable cause to believe that the intended target lived at 108 Gospel Hill Rd. and had access to the main residence and the other structures thereon, a fact that proved to be true and remained true throughout the investigation and search. Furthermore, Sgt. O'Neal investigated the address prior to applying for the warrant and reasonably concluded that the manufactured home appeared to be the "main residence" on the premises based on it's size and the run-down condition of the other structures. However, he also recognized that the other structures could also potentially be living quarters or locations where the target could reposit evidence of his criminal activity. Thus, he sought conditional authorization to search the other structures based on the reasonable circumstances as they unfolded once the search began. *Exhibit A* at 1. O'Neal also noted that the premises contained one mailbox with the name "Villareal" affixed to the side and his further review of county property records lead him to the conclusion that a single family occupied the premises and that each person of the family had equal access and control to the premises and all the structures therein. *See United States v. Schmitz*, 153 F.4th 1334, 1342 (11th Cir. 2025)(Despite ultimately proving to be a multi-dwelling unit "The house had just one mailbox, just one address, just one garbage can, and no exterior markings delineating the apartments…. And for good measure, Valencia reviewed county property records, which also revealed that 4279 Violet Circle was "one single-family home.")

While it is evident that the relevant premises here are occupied by a single-family unit with each member having access and control to the entirety of the premises, *Garrison* represents a situation where two unrelated individuals were neighbors who each had their own distinct residence that could only be accessed by the respective inhabitant of each apartment. And thus when officers in *Garrison* realized they were searching premises that their intended target did not previously have access to, and thus he could not have reasonably secreted evidence of his criminal activity, understandably they were obligated to cease their search once their mistake was revealed. Conversely, Alexis Villareal telling Sgt. O'Neal that he resides in the outbuilding on his family's property did not convey the idea that it is a completely distinct dwelling unit that is off-limits to the other habitants of the property (his family), nor can it be construed as evidence that he does not have free access or control to the manufactured home where his father's safe and guns were eventually located. The information Alexis conveyed is more akin to him telling Sgt. O'Neal "that this other structure is my bedroom but I also live with my family in our manufactured home in which I have free access to for essential functions such as using the restroom, eating meals, visiting my family, and potentially connecting to the internet to download child pornography." At the very least, it is reasonable for Sgt. O'Neal to draw these conclusions based on the evidence before him at the time.

Furthermore, while the general rule under *Garrison* is that a warrant that authorizes the

search of an undisclosed multi-unit dwelling is invalid, courts have also established that there are "of course, exceptions to this rule. The warrant of a multi-unit structure will be valid where (1) there is probable cause to search each unit;4 (2) *the targets of the investigation have access to the entire structure;* or (3) the officers reasonably believed that the premises had only a single unit. *United States v. Perez*, 484 F.3d 735, 741 (5th Cir. 2007)(citing *Garrison*, 480 U.S. at 85–86)(*see also U.S. v. Johnson,* 26 F.3d 669 (7th Cir. 1994); Officer's good faith but mistaken belief that suspects had access to entire property in multi-dwelling unit was sufficient to uphold the search of multi-dwelling unit.) At the time of the search, Alexis Villareal was an 18-year-old individual living on his parents' property in a one room structure with free access to the entirety of the premises, including the manufactured home. Officers conducting the search had no reason to believe otherwise and the Defendant has simply not carried the burden of producing evidence to the contrary.

## PRAYER FOR RELIEF

The Government concedes that the Defendant's statement, "I didn't steal anything," was improperly obtained after the Defendant had invoked his Fifth Amendment right to counsel and should accordingly, be suppressed. However, based on the foregoing, the Government moves this Court to DENY the remainder of the

Page **14** of **15**

Defendant's motion to suppress.

Respectfully submitted,

John G.E. Marck
Acting United States Attorney
Southern District of Texas

By:   *s/ B. Hunter Brown*
       B. Hunter Brown
       Assistant United States Attorney
       713-567-9000
       Benjamin.Brown@usdoj.gov

## CERTIFICATE OF SERVICE

I, Assistant U.S. Attorney B. Hunter Brown, certify that on April 10, 2026, a copy of the

above Motion was served electronically on counsel for the defendant.

*s/ B. Hunter Brown*
B. Hunter Brown
Assistant United States Attorney