United States District Court
Southern District of Texas
**ENTERED**
August 05, 2026
Nathan Ochsner, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CRIMINAL NUMBER H-25-065 |
| | § | |
| ANGEL VILLARREAL-RESENDIZ, | § | |
| | § | |
| Defendant. | § | |

**MEMORANDUM OPINION AND ORDER**

Angel Villarreal-Resendiz ("Defendant") is charged with one count of Possession of a Firearm by a Prohibited Person, in violation of 18 U.S.C. § 922(g)(5).[1] Pending before the court is Defendant's Motion to Suppress (Docket Entry No. 43). For the reasons stated below, Defendant's Motion to Suppress will be granted.

## I. Background

### A. Investigation

On August 10, 2023, the National Center for Missing and Exploited Children received a report regarding an unknown suspect that allegedly uploaded child pornography to an online account utilized by Verizon Wireless communications users.[2] On August 5, 2024, Sergeant Steve O'Neal,

---

[1]Indictment, Docket Entry No. 14, pp. 1–2. All page numbers reference the pagination printed at the top of the page by the court's Electronic Case Filing system.

[2]Affidavit for Search Warrant, Exhibit A to Government's Response to Defendant's Motion to Suppress ("Government's Response"), Docket Entry No. 45-1, p. 3.

an investigator with the Office of the Attorney General of Texas, Criminal Investigations Division, Child Exploitation Unit, was assigned to review the reported files.[3] That same day Sergeant O'Neal applied for and later obtained a search warrant for the online account relating to cell phone number 936-425-0007.[4] The data from the account was obtained on August 28, 2024.[5]

Upon reviewing the data from the online account, Sergeant O'Neal determined that it belonged to Defendant's nineteen-year-old-son, Alexis Villarreal.[6] The account information also revealed Alexis' residence to be 108 Gospel Hill Road, Huntsville, Texas 77320.[7] Sergeant O'Neal searched the Walker County Central Appraisal District records and learned that the listed owners of 108 Gospel Hill Road were Magda Castaneda and Defendant, the parents of Alexis.[8] Sergeant O'Neal also learned that Saimy Villarreal, Defendant and Magda's twenty-one-year-old daughter, resided at 108 Gospel Hill Road.[9]

---

[3]Government's Response, Docket Entry No. 45, p. 2.

[4]Id.; Affidavit for Search Warrant, Exhibit A to Government's Response, Docket Entry No. 45-1, p. 4.

[5]Government's Response, Docket Entry No. 45, p. 2.

[6]Affidavit for Search Warrant, Exhibit A to Government's Response, Docket Entry No. 45-1, p. 4. A search of the account revealed several "selfie" style photos of Alexis and it also revealed a screenshot of an imaging order from Huntsville Memorial Hospital, which contained Alexis' name, date of birth, and address. Id. The search of the account also revealed photos of Alexis cooking in the manufactured home. Transcript of Suppression Hearing ("Suppression Transcript"), Docket Entry No. 70, p. 75 lines 1–9.

[7]Affidavit for Search Warrant, Exhibit A to Government's Response, Docket Entry No. 45-1, p. 4.

[8]Id.

[9]Government's Response, Docket Entry No. 45, pp. 2–3.

On January 14 and 15, 2025, Sergeant O'Neal conducted surveillance at 108 Gospel Hill Road.[10] While conducting surveillance Sergeant O'Neal learned that the property contained a manufactured home, which appeared to be the main residence, and two other smaller structures.[11] It was later discovered that one of the smaller structures was a small cabin.[12]

**B. Search Warrant**

On January 23, 2025, Sergeant O'Neal sought a warrant authorizing the search of Alexis' person and premises at 108 Gospel Hill Road.[13] The search warrant affidavit described the location to be searched as "a manufactured home, constructed of light, tan-colored siding construction with light-colored trim."[14] The affidavit also sought the ability to search other structures, places, and vehicles on the premises if they were "found to be under the control of the suspected party . . . and in, on, or around which said suspected party may reasonably reposit or secrete [child pornography]."[15] Sergeant O'Neal's affidavit described the facts of his investigation and relied on his past experience to show that "collections of child pornography will more than likely be located in the suspect's home" because "a high degree of privacy is necessary to enjoy the collection."[16]

---

[10]Defendant's Motion to Suppress, Docket Entry No. 43, p. 3.

[11]Affidavit for Search Warrant, Exhibit A to Government's Response, Docket Entry No. 45-1, p. 1.

[12]Suppression Transcript, Docket Entry No. 70, p. 43 lines 19–25. The structure used to be a tool shed and was later converted into a cabin at an unknown date. Id.

[13]Affidavit for Search Warrant, Exhibit A to Government's Response, Docket Entry No. 45-1, p. 11.

[14]Id. at 1.

[15]Id.

[16]Id. at 3–5, 8 ¶ 7.

The Honorable Tracy Sorensen of the 278th District Court of Walker County, Texas, issued a warrant for the search of 108 Gospel Hill Road on January 23, 2025.[17]

**C. Execution of Search Warrant**

Around 8:00 AM on January 24, 2025, a team of law enforcement officers comprised of approximately seven officers from the Texas Attorney's General Office and eight officers from the Huntsville Police Department entered 108 Gospel Hill Road to execute the search warrant.[18] Each officer was armed: five or six officers were carrying AR-15-style semi-automatic assault rifles, while the remainder of the officers were carrying hand guns.[19] Before law enforcement officers could execute the search warrant, they had to remove the family members from the structures on the property.

1. Interception of Magda and Saimy

When law enforcement officers entered the property, Madga and Saimy were backing out of the driveway to leave for work.[20] Law enforcement officers intercepted them, informed them in English that they had a search warrant for the premises, and instructed them to get out of their

[17]Search Warrant, Exhibit A to Government's Response, Docket Entry No. 45-1, p. 14.

[18]Suppression Transcript, Docket Entry No. 70, p. 62 lines 10–14, p. 63 lines 16–19, p. 81 lines 2–10.

[19]Id. at 63 lines 9–15, p. 82 lines 10–17. Four to five officers from the Huntsville Police Department were holding AR-15s. Id. at 82 lines 12–17. One officer from the Texas Attorney General's office was holding a rifle, but it is not clear the kind of rifle he was holding. Id. at 63 lines 9–15.

[20]Id. at 10 lines 2-11, p. 89 lines 20–22.

vehicle.[21] Madga and Saimy stood underneath a carport near Detective Lehman for the remainder of the search.[22]

2. Interception of Alexis

Shortly after entering the property, Sergeant O'Neal witnessed Alexis exit from the cabin.[23] Sergeant O'Neal remained with Alexis for a large portion of the search.[24]

3. Interception of Defendant

After law enforcement officers intercepted Magda, Saimy, and Alexis, they intercepted Defendant in his manufactured home. Defendant testified that as he was exiting his bedroom he was met by three to four armed officers.[25] The officers had their guns drawn and were yelling at him to put his hands up.[26] Defendant was searched and then escorted outside.[27] He stood outside near his wife, daughter, and Detective Lehman for the remainder of the search.[28]

---

[21]Id. at 11 lines 8–15, p. 64 lines 13–18, p. 89 line 23 thru p. 90 line 5.

[22]Id. at 10 lines 23–25, p. 83 lines 11–18. Detective Lehman was instructed to stand near Defendant, Magda, and Saimy to ensure they did not enter any of the structures on the property.

[23]Id. at 65 lines 15–19.

[24]Id. at 70 lines 23–25.

[25]Id. at 34 line 17 thru p. 35 line 10.

[26]Id.

[27]Id. at 35 line 12 thru p. 37 line 6.

[28]Id.

Detective Lehman testified that Defendant was permitted to walk around the property during the search as long as he remained outside of the structures.[29] Defendant was not told that he was allowed to leave the premises.[30]

4. The Search of the Cabin and Manufactured Home

Once the family members were removed from the structures on the property, the officers began searching the manufactured home and the cabin.[31]

The search of the cabin revealed that it had a small bedroom with a bathroom and shower, but no kitchen.[32] The cabin also had a computer desk with a computer.[33]

While searching the manufactured home the officers discovered a large locked safe in Defendant's bedroom.[34] Officers approached Defendant to obtain the code for the safe.[35] During this conversation, three to four armed officers stood around Defendant.[36] Defendant testified as follows:

---

[29] Id. at 27 lines 13–20.

[30] Id. at 91 lines 18–24.

[31] Id. at 47 lines 13–19.

[32] Addendum to Government's Response to Defendant's Motion to Suppress, Docket Entry No. 62, p. 1.

[33] Suppression Transcript, Docket Entry No. 70, p. 67 lines 1–6.

[34] Id. at 67 lines 10–13.

[35] Id. at 39 lines 10–25.

[36] Id. at 39 lines 10–25, p. 87 line 23 thru p. 88 line 4. There is conflicting testimony about what type of weapon these officers were carrying. Defendant states that the officers were carrying AR-15 style weapons while Lehman states the officers were armed with handguns. Id. at 39 line 25, p. 88 lines 11–13.

**A** I remember he asked for the code, and I said, "No." I said, "What for?" And he said that they had to see if there was evidence there.

. . .

**A** . . . I had told him I didn't remember [the code] by heart; I had to look it up on my phone. And I tried two, three times, and then he told me, "Don't make this more difficult."[37]

After seeing the numbers of the keypad, Defendant provided law enforcement officers with the code to the safe.[38] Defendant was never informed that he was not required to provide the officers with the code to the safe.[39]

A search of the safe revealed twelve firearms and several hundred rounds of mixed pistol and rifle ammunition.[40]

5. Federal Charges Against Defendant

After law enforcement officers learned that Defendant was residing in the country illegally, he was interviewed at the Huntsville Police Department by Homeland Security Special Agent Nathaniel Yates and Detective Lehman.[41] On January 28, 2025, Agent Yates filed a Criminal Complaint, charging Defendant with a violation of 18 U.S.C. § 922(g)(5).[42]

On March 4, 2026, Defendant filed a Motion to Suppress, arguing that evidence of the firearms and ammunition should be suppressed because they were obtained as the result of (1) an

---

[37] Id. at 40 lines 18–20, p. 41 lines 7–11.

[38] Id. at 52 line 11 thru p. 53 line 11. It is disputed whether Defendant looked at a keypad on his phone or whether officers took a picture of the safe and showed it to Defendant. Id. at 85 line 20 thru p. 86 line 6.

[39] Id. at 54 line 25 thru p. 55 line 2.

[40] Criminal Complaint, Docket Entry No. 1, p. 2 ¶ 7.

[41] Defendant's Motion to Suppress, Docket Entry No. 43, pp. 7–8.

[42] Criminal Complaint, Docket Entry No. 1, p. 2 ¶ 2.

improper search and (2) a violation of Defendant's Fifth Amendment right against self-incrimination.[43] Defendant also argues that the statements Defendant made during his interview at the Huntsville Police Department should be suppressed because he "was subjected to custodial interrogation in the absence of Miranda warnings and after he had requested the presence of an attorney."[44] The Government filed a response on April 10, 2026.[45] On July 22, 2026, the court held a hearing on Defendant's Motion to Suppress.[46] Magda, Defendant, Sergeant O'Neal, and Detective Lehman testified at the hearing.[47]

## II. Analysis

### A. The search of Defendant's home and safe were within the scope of the warrant and were reasonable under the Fourth Amendment.

Defendant argues that law enforcement's search of (1) the manufactured home and (2) the safe in Defendant's bedroom was unreasonable.[48]

#### 1. Search of Manufactured Home

Defendant relies on Maryland v. Garrison, 107 S. Ct. 1013 (1987), to argue that officers were obligated to cease their search of the manufactured home once they discovered that Alexis resided

---

[43]Defendant's Motion to Suppress, Docket Entry No. 43, p. 1.

[44]Id. at 12. The Government has conceded that Defendant's statements were improperly obtained and should be suppressed. Government's Response, Docket Entry No. 45, p. 10.

[45]Government's Response, Docket Entry No. 45.

[46]Hearing, Docket Entry No. 63, p. 1.

[47]Id.

[48]Defendant's Motion to Suppress, Docket Entry No. 43, pp. 15–21. Defendant has made it clear that he is not challenging the validity of the search warrant itself; he is only challenging its execution.

in the cabin.[49] In Garrison the Supreme Court held that officers are "required to discontinue the search" of a unit when they become aware that the unit may be "erroneously included within the terms of the warrant." 107 S. Ct. at 1018. The opinion dealt with a warrant that was obtained to search the third floor apartment of 2036 Park Avenue. Id. at 1014. When applying for and executing the warrant, the officers reasonably believed that there was only one apartment on the third floor of the building. Id. However, during the execution of the warrant, the officers realized that the third floor contained two separate apartments, one occupied by the suspect, McWebb, and one occupied by Garrison. Id. When the officers realized that they were erroneously searching Garrison's apartment, they ceased their search. Id. at 1015. The Supreme Court explained that "[i]f the officers had known, or should have known, that the third floor contained two apartments before they entered the living quarters on the third floor, and thus had been aware of the error in the warrant, they would have been obligated [under the Fourth Amendment] to limit their search to McWebb's apartment." Id. at 1017–18.[50]

Garrison does not apply in this case because the officers conducting the search were never confronted with facts that would lead them to believe that the manufactured home was "erroneously included within the terms of the warrant." 107 S. Ct. at 1018. Sergeant O'Neal sought a search warrant authorizing the search of the manufactured home based on his reasonable belief that Alexis and his family resided in the manufactured home.[51] Sergeant O'Neal believed that the manufactured

[49] Id. at 15–19.

[50] The Supreme Court ultimately "held that under the circumstances presented, the seizure of contraband from Garrison's apartment did not violate the Fourth Amendment." United States v. Perez, 484 F.3d 735, 740 (5th Cir. 2007).

[51] Affidavit for Search Warrant, Exhibit A to Government's Response, Docket Entry No. 45-1, p. 1.

home was the primary residence "based on the size and condition of it as opposed to the other two [structures on the property]."[52] Although the officers learned that Alexis resided in the cabin during the execution of the search warrant, that fact is not sufficient on its own to establish that the manufactured home was not within the scope of the warrant. Unlike in Garrison, where it was clear that the suspect had no access to the separate apartment that was being searched, in this case the officers on the scene learned that Alexis had unfettered access to the manufactured home: A search of the cabin revealed that Alexis had a bedroom, closet, and bathroom, but he did not have a kitchen.[53] Both Magda and Defendant testified that Alexis accessed the manufactured home on a daily basis.[54]

The court concludes that the officers conducting the search were never confronted with facts that would lead them to believe that the manufactured home was erroneously included within the terms of the warrant. Accordingly, the officers' execution of the search warrant was reasonable under the Fourth Amendment. Id. at 1019.

2. Search of Defendant's Safe

Defendant argues that the search of the safe in his bedroom was unreasonable because law enforcement officers (1) knew Alexis lived in the cabin, (2) had no reason to believe that Alexis knew the code to the safe, and (3) understood that collections of child pornography are typically kept in the suspect's home.

Because "[t]he execution of a search warrant must be one directed in good faith toward the objects specified in the warrant," the officers must have had probable cause to believe that the safe

[52] Id.

[53] Suppression Transcript, Docket Entry No. 70, p. 67 lines 1–6, p. 75 lines 10–11.

[54] Id.

contained child pornography. United States v. Kimbrough, 69 F.3d 723, 728 (5th Cir. 1995) (internal quotation marks omitted); Garrison, 107 S. Ct. at 1016 ("[T]he scope of a lawful search is "'defined by the object of the search and the places in which there is probable cause to believe that it may be found.'"). Given Alexis' unfettered access to the manufactured home and the fact that at the time of the search law enforcement officers did not know whether Alexis had the code to the safe,[55] it was reasonable to believe that Alexis may have reposited or secreted child pornography in the safe.[56] Accordingly, the court concludes that the search of the safe was within the scope of the search warrant and was reasonable under the Fourth Amendment.

**B. Law enforcement officers compelled Defendant to provide the code in violation of his Fifth Amendment rights.**

Defendant argues that he was instructed to provide the code to a locked safe inside his bedroom in violation of his Fifth Amendment right against self-incrimination.[57] Under the Fifth Amendment no person "shall be compelled in any criminal case to be a witness against himself." U.S. CONST. AMEND. V. "To qualify for the Fifth Amendment privilege against self-incrimination, a communication must be (1) testimonial in character, (2) incriminating, and (3) compelled." United States v. Velasquez, 881 F.3d 314, 337 (5th Cir. 2018).

1. Providing the code to law enforcement officers was an incriminating and testimonial statement.

"'[I]n order to be testimonial, an accused's communication must itself, explicitly or implicitly, relate a factual assertion or disclose information." Id. (quoting Doe v. United States, 108

---

[55]Id. at 67 lines 16–17.

[56]Affidavit for Search Warrant, Exhibit A to Government's Response, Docket Entry No. 45-1, p. 1.

[57]Id. at 9–12.

S. Ct. 2341, 2347 (1988)). A testimonial statement is incriminating when "'the witness reasonably believes [it] could be used in a criminal prosecution or could lead to other evidence that might be so used.'" Hiibel v. Sixth Judicial District Court of Nevada, Humboldt County, 124 S. Ct. 2451, 2460 (2004).

Providing the code to the officers was an incriminating, testimonial statement. By disclosing the code, Defendant led law enforcement officers to evidence that is currently being used to prosecute him. See United States v. Guia-Lopez, No. 22-50234, 2023 WL 5236764, at *6 (Aug. 15, 2023) (concluding that "the district court was correct to suppress the passcode because asking [the defendant] to write down his password was a Fifth Amendment violation because this request was likely to, and did, result in testimonial evidence").

2. The code was compelled.

"Whether a confession is admissible or not turns on whether it was made voluntarily." United States v. Cantu-Ramirez, 669 F.3d 619, 624 (5th Cir. 2012). "The voluntariness of a defendant's statement is reviewed based on the totality of the circumstances surrounding the interrogation." United States v. Carmouche, 18 F.Supp.3d 838, 842 (S.D. Tex. 2014). "When reviewing the totality of the circumstances, both the characteristics of the accused and details of the interrogation should be considered." Id. "A confession is voluntary if, under the totality of the circumstances, the statement is the product of the accused's free and rational choice." United States v. Broussard, 80 F.3d 1025, 1033 (5th Cir. 1996).

The totality of the circumstances establish that Defendant was compelled to provide the code to the safe in his bedroom to law enforcement officers. Defendant was continually subjected to

displays of force by law enforcement officers. On the morning of January 24, 2025, fourteen to fifteen officers entered Defendant's property without warning.[58] Each officer was armed: at least five to six officers were carrying AR-15 style assault rifles and the rest carried hand guns.[59] Before beginning the search, the officers removed Defendant from his home. To do so, three to four officers kicked down the door to Defendant's home, screamed at him to keep his hands in the air, and ordered him outside at gunpoint.[60]

Then, upon being removed from his home at gunpoint, Defendant's movement was limited by law enforcement officers. Although Defendant was free to move around his property, he was physically accompanied by Detective Lehman, a six foot-three, 285-pound officer, who was specifically tasked with staying with Defendant during the search.[61] It was never communicated to Defendant that he was free to leave his property.[62] Compare Howes v. Fields, 132 S. Ct. 1181, 1195 (2012) ("Critical to the Court's judgment [that the confession was voluntary and did not violate Miranda] is the undisputed fact that [the defendant] was told that he was free to end the questioning and to return to his cell.") (internal quotation marks omitted).

Once he was outside, Detective Lehman told Defendant that the officers possessed a search warrant.[63] See Bumper v. North Carolina, 88 S. Ct. 1788, 1792 (1968) ("When a law enforcement

---

[58]Suppression Transcript, Docket Entry No. 70, p. 62 lines 10–14, p. 63 lines 16–19, p. 81 lines 2–8.

[59]Id. at 63 lines 9–15, p. 82 lines 10–17.

[60]Id. at 12 lines 11-12, p. 34 line 17 thru p. 35 line 10.

[61]Id. at 10 lines 23–25, p. 27 lines 13–20, p. 83 lines 11–18, p. 96 lines 1–9.

[62]Id. at 91 lines 18–24.

[63]Id. at 38 lines 3–10.

officer claims authority to search a home under a warrant, he announces in effect that the occupant has no right to resist the search."). However, Detective Lehman never went "into any detail" about what the warrant was for.[64]

About an hour into the search, three to four officers surrounded Defendant and told him that they needed the code to the safe.[65] Although it is disputed whether these officers were carrying AR-15 style assault rifles, it is clear that at the time of the conversation, there were several officers milling around the property with AR-15 style assault rifles.[66] See Berkemer v. McCarty, 104 S. Ct. 3138, 3149 (1984) ("To be sure, the aura of authority surrounding an armed, uniformed officer and the knowledge that the officer has some discretion in deciding whether to issue a citation, in combination, exert[s] some pressure on the detainee to respond to questions.").

Defendant was never informed that he was not required to provide the officers with the code to the safe.[67] Compare Howes, 132 S. Ct. at 1195 (relying on the fact that the defendant had been told he was free to end the questioning and to return to his cell to hold that his confession was voluntary and did not violate Miranda). In fact, when Defendant initially was hesitant to provide the officers with the code, he was told not to "make this more difficult."[68] Eventually Defendant provided law enforcement officers with the code to the safe.[69]

---

[64] Id. at 84 lines 1–6, p. 94 lines 2–5.

[65] Id. at 38 lines 3–10.

[66] Id. at 39 line 25, p. 62 lines 10–14, p. 63 lines 16–19, p. 81 lines 2–8, p. 87 line 23 thru p. 88 line 4, p. 88 lines 11–13.

[67] Id. at 54 line 25 thru p. 55 line 2.

[68] Id. at 40 lines 18–20, p. 41 lines 7–11.

[69] Id. at 52 line 11 thru p. 53 line 11.

Considering the show of force by the number of law enforcement officers present and the continual display of AR-15 style assault rifles, the limitations on Defendant's movement, and officers' reference to a search warrant, the court concludes that providing the code to law enforcement officers was not a product of Defendant's "free and rational choice" Broussard, 80 F.3d at 1033; see also Bumper, 88 S Ct. at 1792; Berkemer, 104 S. Ct. at 3149; compare Howes, 132 S. Ct. at 1195. Accordingly, the court concludes that law enforcement officers compelled Defendant to provide the code to the safe in violation of his Fifth Amendment rights. Because the Supreme Court "requires the exclusion of the physical fruit of actually coerced statements," the firearms and ammunition discovered in the safe must be suppressed.[70] United States v Patane, 124 S. Ct. 2620, 2628, 2630 (2004) (discussing New Jersey v. Portash, 99 S. Ct. 1292, 1296–97 (1979)).

## III. Conclusions & Order

For the reasons explained above, Defendant's Motion to Suppress (Docket Entry No. 43) is **GRANTED**, and Defendant's statements made to law enforcement officers following an un-Mirandized custodial interrogation and the firearms and ammunition discovered as a result of a compelled statement are hereby **SUPPRESSED**.

**SIGNED** at Houston, Texas, on this the 5th day of August, 2026.

SIM LAKE
SENIOR UNITED STATES DISTRICT JUDGE

[70]Criminal Complaint, Docket Entry No. 1, p. 2 ¶ 7.